UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DWAYNE A. ANDERSON,<br><br>Defendant. | 4:23-CR-40018-RAL<br><br><br>OPINION AND ORDER DENYING<br>MOTION TO DISMISS INDICTMENT |

Defendant Dwayne A. Anderson has filed a Motion to Dismiss Indictment. Doc. 43. Anderson alleges a violation of his Sixth Amendment right to a speedy trial. For the reasons set forth below, the motion is denied.

I.  **Facts and Procedural Background**

On February 14, 2023, Anderson was indicted on eight counts of wire fraud in violation of 18 U.S.C. §§ 1343 and 2. Doc. 1. The indictment alleges that, beginning in as early as 2010, Anderson, while living in Jamaica, participated in a scheme to defraud an alleged victim living in California. Doc. 1 at 1–2. Using telephone, text messaging, and email, Anderson purportedly convinced the alleged victim that she had won millions in a sweepstakes and that she needed to send money by wire to pay for certain fees associated with the sweepstakes. Id. at 2. The alleged victim paid the requested fees. Id. at 3. Anderson instructed the alleged victim to deposit her funds into bank accounts controlled by another individual who is a resident of South Dakota. Id. The individual then, at the direction of Anderson, forwarded the money to Anderson. Id. The indictment also alleges that Anderson convinced the alleged victim to travel to Jamaica on

1

September 8, 2017, to collect her winnings. Id. Anderson instructed the victim to bring $1,600 cash with her to pay for a stay at a Jamaican resort and that she should give the money to her driver at the airport. Id.

Following the indictment, the Clerk of Court issued an arrest warrant for Anderson. Doc. 18. Anderson is a Jamaican citizen who, at the time the indictment was filed, was living in Jamaica. Doc. 1 at 2. To bring Anderson to South Dakota for prosecution of this case, the Government submitted an extradition request. Extradition between the United States and Jamaica is governed by an extradition treaty, the Extradition Treaty Between the Government of the United States of America and the Government of Jamaica, U.S.-Jam., June 14, 1983 ("Treaty"). Extradition requests must follow a prescribed process laid out in Article VIII of the Treaty. Article VIII states that extradition requests "shall be made through the diplomatic channel," and each request shall be supported by:

> (a) documents, statements, or other evidence which describe the identity and probable location of the person sought;
> (b) a statement of the facts of the case, including, if possible, the time and location of the offence;
> (c) a statement of the provisions of the law describing the essential elements and the designation of the offence for which extradition is requested;
> (d) a statement of the provisions of the law prescribing the punishment for the offence; and
> (e) a statement of the provisions of the law prescribing any time limit on the prosecution or the execution of punishment for the offence.

Id. For a person who is sought for prosecution, the request shall also be supported by: "(a) a copy of the warrant of arrest issued by a judge or other judicial authority in the Requesting State; and (b) such evidence as would justify the committal for trial of that person if the offence had been committed in the Requested State." Id. In this matter, the United States is the "Requesting State," and Jamaica is the "Requested State."

To comply with the requirements of the Treaty, the Office of International Affairs ("OIA") of the Criminal Division of the United States Department of Justice ("DOJ") facilitates its own formalized process between relevant government offices for submitting an extradition request. Doc. 51-1 at 3–4. The process begins with the prosecuting office sending a package of materials to OIA in support of an extradition request. Id. at 4. Once received, an OIA attorney reviews the materials to ensure the package complies with the Treaty's requirements, suggesting revisions to the prosecuting office as needed. Id. After the extradition package is finalized, documents contained in the package are authenticated. Id. Then the package is submitted to the Department of State for its own review. Id. The Department of State prepares a cable to the U.S. Embassy in Kingston, Jamaica, and directs the preparation of a diplomatic note requesting extradition. Id. The Department of State sends the materials provided by OIA to the Embassy, and from there, the Embassy presents the materials to the Jamaican government under cover of the diplomatic note requesting extradition. Id. The Jamaican Ministry of Foreign Affairs receives the request and passes it to Jamaica's Ministry of Justice. Id. at 5. If the extradition request is granted, OIA works with Jamaican authorities to return the fugitive to the United States. Id.

On February 15, 2023, the day after Anderson's indictment was filed, OIA contacted both DOJ's Consumer Protection Branch and the U.S. Attorney's Office for the District of South Dakota ("USAO") about seeking extradition of Anderson and sent extradition documents to each office. Id. On June 2, 2023, the Consumer Protection Branch and USAO submitted initial drafts of the extradition request to OIA. Id. at 5–6. Between August 30, 2023, and January 11, 2024, OIA, USAO, and the Consumer Protection Branch exchanged numerous drafts of the extradition request. Id. at 6. On January 22, 2024, OIA sent the Consumer Protection Branch and USAO

instructions on executing a final extradition package, and on May 15, 2024, received the completed extradition package. Id.

On June 14, 2024, the Department of State transmitted a cable to the Embassy instructing the Embassy to present a diplomatic note to Jamaican authorities seeking Anderson's extradition, and on June 20, 2024, the Embassy presented the diplomatic note. Id. The Embassy contacted OIA on July 11, 2024, informing OIA that Anderson was arrested pursuant to the extradition request. Id. Anderson consented to extradition on July 17, 2024. Id. The Jamaican Minister of Justice signed a surrender warrant on July 31, 2024. Id. Anderson was subsequently transported to the United States on August 22, 2024, arriving in Sioux Falls, South Dakota. Id. at 7.

The day after he arrived in the United States, on August 23, 2004, Anderson was arraigned and detained. Doc. 16. On January 28, 2025, Anderson moved to dismiss his indictment, alleging the delay between his indictment and arrest violated his Sixth Amendment speedy trial right. Doc. 43. The Government opposes the motion, arguing it worked diligently to secure Anderson's apprehension and extradition. Doc. 51.

## II.   Discussion

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy . . . trial." U.S. Const. amend. VI. The right to a speedy trial "attaches at the time of arrest or indictment, whichever comes first, and continues until the trial commences." United States v. Erenas-Luna, 560 F.3d 772, 776 (8th Cir. 2009) (citation omitted). In this case, indictment preceded arrest, and thus, Anderson's speedy trial right attached when he was indicted on February 14, 2023. Doc. 1. To determine whether a defendant's Sixth Amendment right to a speedy trial was violated, this Court examines the following four factors: (1) the length of the delay, (2) the reason for the delay, (3) the defendant's assertion of his right to

4

a speedy trial, and (4) the prejudice to the defendant. Barker v. Wingo, 407 U.S. 514, 530 (1972). No one factor is either "a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial." Id. at 533.

The first factor—length of delay—involves a double inquiry. First, the defendant must show that the length of delay was "presumptively prejudicial" to trigger further speedy trial analysis. Id. at 530. If the defendant can make this showing, then this Court must consider "the extent to which the delay stretches beyond the bare minimum needed to trigger judicial examination of the claim." Doggett v. United States, 505 U.S. 647, 652 (1992). "A delay approaching one year may meet the threshold for presumptively prejudicial delay requiring application of the Barker factors." United States v. Jeanetta, 533 F.3d 651, 656 (8th Cir. 2008).

There was an approximately 17-month delay between Anderson's indictment on February 18, 2023, and his arrest on July 11, 2024. This delay was several months longer than a one-year delay typically sufficient to trigger further speedy trial analysis. Despite the delay exceeding one year, the Government argues that this Court need not proceed any further in the speedy trial analysis because the Government acted promptly. Doc. 51 at 7. Whether the Government acted promptly or not is a question more suitable for this Court's analysis of the second factor. Here, the 17-month delay was presumptively prejudicial, triggering further analysis. The delay extended five months beyond the one-year minimum threshold. Accordingly, the first factor weighs in Anderson's favor.

Next, this Court assesses the reasons for delay and evaluates "whether the government or the criminal defendant is more to blame." Erenas-Luna, 560 F.3d at 777 (quoting Doggett, 505 U.S. at 651). An intentional delay by the Government will weigh heavily against the Government, whereas delay by the defense will weigh against the defendant. Id. Mere negligence by the

Government weighs less heavily against it but is still a "considerable factor in the weighing process." Id. "[A] valid reason, such as a missing witness, should serve to justify appropriate delay." Barker, 407 U.S. at 531.

Anderson makes no claim of intentional delay by the Government, nor does he provide any evidence to that effect. Indeed, the record demonstrates that the Government exercised reasonable diligence in pursuing extradition of Anderson from Jamaica following his indictment. On February 15, 2023, the day after Anderson's indictment was filed, the USAO was communicating with OIA about seeking extradition of Anderson. Between February 15, 2023, and July 11, 2024, the Government was actively pursuing Anderson's extradition, following the process required by the Treaty and instituted by the OIA. The extradition process involves "multiple levels of review and certification," which necessarily take time. See United States v. Cortorreal, 23-7195, 2024 WL 4635230, at *2 (2d Cir. 2024) (finding two-and-a-half-year delay between indictment and extradition was justified in part due to the lengthy extradition process). "The delay in arresting [Anderson] was attributable primarily to his continued residence in an area over which the United States had no control . . . ." United States v. Tchibassa, 452 F.3d 918, 926 (D.C. Cir. 2006). Thus, the lengthy extradition process is "a valid reason . . . justify[ing] appropriate delay." Barker, 407 U.S. at 531.

Anderson suggests that the Government should have been pursuing extradition during the months leading up to the indictment because the Government was already aware of Anderson's location. Doc. 57 at 2. However, pursuing extradition prior to the indictment may have been futile. First, the obligation to extradite captured in the Treaty is limited to "persons who the competent authorities in the Requesting State have *charged* with an extraditable offence committed within its territory" or "persons who have been convicted." Extradition Treaty

Between the Government of the United States of America and the Government of Jamaica (emphasis added). Second, Article VIII of the Treaty requires that an extradition request be supported by "a copy of the warrant of arrest issued by a judge . . . in the Requesting State." Id. In the United States, arrest warrants must "describe the offense charged." Fed. R. Crim. P. 4(b)(1)(B); see also Fed. R. Crim. P. 9(b)(1). True, the Government could have completed preliminary steps under the assumption that Anderson would ultimately be indicted and could have withheld submitting the extradition request until Anderson was indicted in order to comply with the Treaty. But indictments are not guaranteed. See United States v. Mandujano, 425 U.S. 564, 571 (1976) ("[T]he grand jury continues to function as a barrier to reckless or unfounded charges."). In the event the grand jury did not deliver an indictment in this case, the preparatory work predicated on extradition that Anderson suggests would have been for naught. Waiting until the indictment was filed to pursue extradition was reasonable and does not weigh against the Government.

The indictment was filed on February 14, 2023, and Anderson likely was unaware of the charges until around the time of his arrest on July 11, 2024. Doc. 44 at 7 ("Anderson would have also learned about the charges against him during the extradition process."). The delay thus cannot be attributed to Anderson, as there is no evidence that Anderson was actively evading law enforcement. The second factor is neutral.

The third factor is the assertion of the speedy trial right by the defendant. "A defendant has no duty to bring himself to trial;" that is the duty of the Government. Barker, 407 U.S. at 527. Yet, "a defendant has some responsibility to assert a speedy trial claim." Id. at 529. But when a defendant is unaware that an indictment has been filed against him, the third factor weighs neither for nor against the defendant. See Erenas-Luna, 560 F.3d at 778. As noted above,

Anderson likely did not learn of the charges filed against him until around the time of his arrest on July 11, 2024. Doc. 44 at 7. Moreover, because Anderson is challenging the pre-arrest delay, his "post-arrest assertion of his speedy-trial right has little bearing on his claim." Id. Thus, the third factor weighs neither in favor nor against Anderson.

Finally, this Court must determine whether Anderson suffered prejudice because of the delay. This factor is assessed "in the light of the interests of defendants which the speedy trial right was designed to protect." Barker, 407 U.S. at 532. The interests are "(i) to prevent oppressive pretrial incarceration; (ii) to minimize anxiety and concern of the accused; and (iii) to limit the possibility that the defense will be impaired." Id. "Of these forms of prejudice, the most serious is the last, because the inability of a defendant adequately to prepare his case skews the fairness of the entire system." Doggett, 505 U.S. at 654 (cleaned up and citation omitted). Anderson can claim only the last form of prejudice—that his defense will be impaired—because he was neither incarcerated nor aware of his indictment during the challenged delay.

"[C]onsideration of prejudice is not limited to the specifically demonstrable, and . . . affirmative proof of particularized prejudice is not essential to every speedy trial claim." Id. at 655. However, if the Government exercised reasonable diligence in apprehending the defendant, the defendant must make a showing of actual prejudice. See Erenas-Luna, 560 F.3d at 778–79. Even when a delay is "extraordinary," a defendant must still show that he experienced actual prejudice if the Government pursued the defendant with reasonable diligence. See United States v. Rodriguez-Valencia, 753 F.3d 801, 808 (8th Cir. 2014) (holding defendant was still required to show actual prejudice where the delay between his indictment and arrest was over six years). In the context of the Fifth Amendment's prohibition against unreasonable pre-indictment delay, proving actual prejudice requires the defendant to "identify witnesses or documents lost during the

period of delay, and not merely make speculative or conclusory claims of possible prejudice caused by the passage of time." United States v. Sprouts, 282 F.3d 1037, 1041 (8th Cir. 2002).

Anderson fails to show that he experienced actual prejudice due to the 17-month delay. Because the Government acted with reasonable diligence to apprehend Anderson, Anderson must make a showing of actual prejudice. Erenas-Luna, 560 F.3d at 778–79. Anderson offers two examples of how the defense is impaired by the delay. First, Anderson suggests his ability to track down exculpatory evidence and witnesses is hampered. Second, Anderson argues that the Government's potential witnesses' memories will be unreliable due to the delay. Anderson has not identified specific witnesses or documents that have been lost during the 17-month delay. Rather, Anderson only speculates about the possibility of lost evidence. Although Anderson identifies two potential Government witnesses whose memories could be impaired—the alleged victim's son and a postal inspector—Anderson's "vague claims regarding witness memory loss . . . [is] insufficient, without more, to satisfy his burden." Id. at 779. Anderson's claim of witness memory loss likewise is speculative. Moreover, the Government intends to rely heavily on "documents, electronic transactions, and memorialized communications" in its case against Anderson. Doc. 51 at 13. Because Anderson fails to show actual prejudice, the fourth factor weighs in the Government's favor.

In reviewing each of the four Barker factors, Anderson's Sixth Amendment right to a speedy trial was not violated.

### III. Conclusion

For the foregoing reasons, it is

ORDERED that Anderson's Motion to Dismiss Indictment, Doc. 43, is denied.

DATED this 13th day of March, 2025.

BY THE COURT:

_____
ROBERTO A. LANGE
CHIEF JUDGE